OPINION
{¶ 1} Defendant-appellant, Diversified Air Systems (DAS), appeals from a Mahoning County Common Pleas Court judgment ruling in favor of plaintiff-appellee, Walter Gruger, on Gruger's claims for outstanding commissions due and breach of a lease and on DAS's counterclaim, following a bench trial to a magistrate.
 {¶ 2} The Phoenix Electric Company (Phoenix) was wholly owned by Gruger. In March 1998, Phoenix entered into an agreement with DAS whereby DAS purchased Phoenix's assets. As part of the consideration, DAS agreed to provide Gruger with a three-year employment agreement. Additionally, Gruger agreed to provide DAS with a lease and a covenant not to compete. Thus, Gruger was both DAS's employee and its landlord. While the lease and the covenant not to compete were put into writing and signed by both parties, the employment agreement was not. The terms of Gruger's employment agreement called for: $5,000 per month salary for the first three months; $40,000 yearly salary thereafter the following three years of the agreement; and commissions in addition to salary. The lease ran from March 26, 1998 through February 28, 2002, which included a one-year extension. DAS agreed to pay its proportionate share of the utilities pursuant to a sub-metering arrangement.
 {¶ 3} During 1998, DAS paid Gruger commissions totaling $12,187.56 over a seven-month period. No problems arose during this time. However, DAS complained to Gruger regarding his tardiness in completing paperwork and reports.
 {¶ 4} During 1999, DAS paid Gruger commissions totaling $14,649.09. DAS continued to complain to Gruger that he was not filing paperwork in a complete and timely manner. It suggested that commissions were being held up until Gruger submitted the proper reports. Additionally, during 1999, DAS reassigned Gruger several times, limiting his sales territory to only four counties, and eventually assigning him to handle only inside sales. Despite these limited assignments, Gruger was involved in other sales for which DAS paid him commissions.
 {¶ 5} During 2000, DAS only paid Gruger commissions for the first few months totaling $1,265.93. DAS once again reprimanded Gruger for his failure to *Page 2 
complete reports and warned that it would not pay him commissions until his reports were in. Furthermore, during this time, Gruger claimed that DAS encouraged him to continue his sales efforts as he had in 1998 and 1999, even though doing so required him to solicit sales beyond what DAS had previously assigned him to do. Gruger believed that he would receive his usual commissions for these efforts.
 {¶ 6} Gruger's last day of employment was February 28, 2001. Gruger requested that DAS pay his commissions. DAS's president Vince Lisi, asked Gruger to prepare a list of the customers for which he believed DAS owed him commissions along with supporting information regarding the sales and commission amounts claimed. Gruger submitted the list to DAS. Gruger gathered the information in the list from researching sales records in his files, sales records at the office, and information from other sales representatives with whom he had worked.
 {¶ 7} Gruger claimed $12,047.76 in commissions were due to him and supported these claimed commissions with a list of sales. After Gruger submitted his request for commissions, DAS issued him a check on June 28, 2001, for $1,847.92, which Gruger returned.
 {¶ 8} As to the lease, DAS gave Gruger notice of its intent to leave the premises several months prior to the expiration of the lease. Gruger advised DAS to take steps to "winterize" the premises in order to lessen the utility expenses. DAS followed Gruger's suggestions and paid the costs involved. However, heat was still maintained in the premises. DAS did not pay for the last four months of utility bills.
 {¶ 9} DAS discontinued its operations and began moving its equipment from the building in the fall of 2001. During this time, Gruger had some remodeling work done to the leased area to remove a part of the structure that was in danger of collapse.
 {¶ 10} On June 28, 2002, Gruger filed a complaint against DAS asserting that DAS breached the oral employment contract and failed to pay rent, utilities, and certain damages due under its lease with Gruger. DAS filed a counterclaim asserting claims for reimbursement for various bills that it paid that it alleged Gruger *Page 3 
should have paid and for reimbursement for loss of use of the building during the time Gruger had the remodeling work done.
 {¶ 11} The case proceeded to a bench trial before a magistrate. The magistrate ruled in Gruger's favor finding that DAS owed him $12,047.76 for commissions due and $7,020.56 for lease-related damages, plus interest. It also ruled in Gruger's favor on DAS's counterclaim.
 {¶ 12} DAS filed objections to the magistrate's decision. The trial court overruled the objections and entered judgment in favor of Gruger for the amounts set out in the magistrate's decision. DAS appealed from that decision.
 {¶ 13} On appeal, this court determined that the trial court abused its discretion in overruling DAS's objections without waiting for and reviewing the transcript of the magistrate's trial. Gruger v.Diversified Air Sys., Inc., 7th Dist. No. 05-MA-103, 2006-Ohio-3568, at ¶ 23. Because the trial court did not have the transcript when it ruled on DAS's objections, we determined it would not be proper for this court to consider the transcript as would be necessary to rule on DAS's other assignments of error. Id. at ¶ 35. Thus, we reversed the trial court's judgment and remanded the matter so that the trial court could reconsider DAS's objections after reviewing the trial transcript and exhibits.
 {¶ 14} On remand, the trial court reviewed the trial transcript and exhibits and reconsidered DAS's objections. The court found no error with the magistrate's decision and, therefore, adopted the decision. The court then entered judgment, awarding Gruger the sums set out in the magistrate's decision, with interest, and ruling in Gruger's favor on DAS's counterclaim.
 {¶ 15} On March 6, 2007, DAS once again filed a timely notice of appeal.
 {¶ 16} DAS raises seven assignments of error. However, it appears that DAS simply resubmitted its brief from its first appeal. DAS's fifth assignment of error[1] was *Page 4 
the basis for our reversal and remand in Gruger, 7th Dist. No. 05-MA-103. Thus, we need not reconsider it here. It is moot.
 {¶ 17} DAS lists six other assignments of error. However, its arguments do not entirely coincide with its assignments of error. We will attempt to ferret out DAS's arguments as they relate to its assignments of error. Additionally, we will address DAS's assignments of error out of order for ease of discussion.
 {¶ 18} DAS's first assignment of error states:
 {¶ 19} "WHETHER MANUFACTURED, HEARSAY EXHIBITS CONCOCTED UP BY THE PLAINTIFF FOR USE AT TRIAL, WHICH WERE NOT BUSINESS RECORDS, SHOULD HAVE BEEN ADMITTED AND CREDITED BY THE MAGISTRATE JUDGE WHEN APPELLEE GRUGER NEVER DID THE WORK; WAS NOT ASSIGNED TO DO THE WORK; THE COMMISSIONS WERE PAID TO OTHERS; AND THE RECORDS THEMSELVES HAD NO FOUNDATION WHATSOEVER."
 {¶ 20} DAS's assignment of error argues that the magistrate should not have considered Plaintiff's Exhibit 6 (Exhibit 6) because it was hearsay. However, it makes no further argument on this point until its reply brief.
 {¶ 21} On the other hand, Gruger argues that the magistrate properly admitted Exhibit 6 because it falls under the "regularly-conducted business" exception to the hearsay rule. He argues that he produced the spreadsheet that became Exhibit 6 at the urging of Lisi, DAS's owner. (Tr. 91). He also argues that the information in Exhibit 6 came from sales reports, which were kept in the regular course of business.
 {¶ 22} The decision to admit or exclude evidence rests in the trial court's sound discretion and we will not reverse its decision absent an abuse of that discretion. Wightman v. Consolidated Rail Corp. (1999),86 Ohio St.3d 431, 437, 715 N.E.2d 546. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. *Page 5 
 {¶ 23} Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. Evid. R. 801(C). Generally, hearsay is inadmissible. Evid. R. 802. However, numerous exceptions exist to the hearsay rule. One such exception allows a party to introduce records of regularly conducted activity. Evid. R. 803(6). It permits a party to introduce:
 {¶ 24} "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Evid. R. 803(6).
 {¶ 25} Thus, records of regularly conducted business activity are admissible as shown by testimony of a custodian or other qualified person. State v. Wallace, 7th Dist. No. 05-MA-172, 2007-Ohio-3184, at ¶ 21. The witness must be "sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance, and retrieval that he can reasonably testify on the basis of this knowledge that the record is what it purports to be and that it was made in the ordinary course of business consistent with the elements of Evid. R. 803(6)." Id.
 {¶ 26} Exhibit 6 is a 12-page spread sheet. For each commission Gruger asserted he was owed, Exhibit 6 lists the invoice number, date, customer, sale item, amount billed, cost to the company, profit to the company, commission percentage, commission amount, the source where Gruger gathered his information, the commission due, whether any commission had already been paid, and whether any other sales person was entitled to share in the commission.
 {¶ 27} The magistrate determined that although he would admit Exhibit 6, the lack of supporting documents would affect the weight he would give to it. (Tr. 359). He noted that he would prefer to have the supporting documents but, given that most *Page 6 
were destroyed in a flood, he would nonetheless admit the exhibit. (Tr. 359).
 {¶ 28} We are not dealing with a typical business record here. Instead, Exhibit 6 is a compilation of many of DAS's business records. The actual records from which Gruger retrieved the information contained in Exhibit 6 were not produced. Gruger stated that most of these records were destroyed in a flood. However, Gruger and Lisi, DAS's president and Gruger's boss, both testified that Gruger produced Exhibit 6 at DAS's request that he do so, which means that Gruger prepared Exhibit 6 at the request of his boss in the course of business. (Tr. 107). Additionally, Gruger gathered the information contained in Exhibit 6 from various sources including quotes, invoices, file letters, and disks. (Tr. 343-45). He testified that all of these sources were documents kept by DAS in its ordinary course of business. (Tr. 343-45).
 {¶ 29} DAS did not contest the accuracy of the figures contained in Exhibit 6. In fact, Lisi basically testified that the figures were accurate. (Tr. 419, 424). And Richard Sed, DAS's employee who was assigned to determine Gruger's commission, testified that he had no reason to believe that Gruger's figures were inaccurate. (Tr. 197-98). Additionally, Jim Portale, one of DAS's salesmen who worked with Gruger, testified that Gruger worked on all of the accounts he listed on Exhibit 6. (Tr. 141-45).
 {¶ 30} Given this corroborating evidence and the magistrate's statement that the lack of supporting documents would affect the weight he would give to Exhibit 6, it was not an abuse of discretion to admit the exhibit. Furthermore, Gruger generated Exhibit 6 by compiling information that DAS kept in its regular course of business. And DAS had the opportunity to cross-examine Gruger regarding all of the information in Exhibit 6 and how Gruger obtained it. Presumably, DAS kept track of what commissions it owed its employees. It could have easily cross-examined Gruger using its own records to dispute amounts it believed were not owed to Gruger.
 {¶ 31} Accordingly, DAS's first assignment of error is without merit. *Page 7 
 {¶ 32} DAS's second assignment of error states:
 {¶ 33} "WHETHER THE MAGISTRATE JUDGE IMPROPERLY SUPPLIED PLAINTIFF GRUGER WITH QUASI CONTRACTUAL THEORIES OF RECOVERY WHEN THE PLAINTIFF NEVER PLED THOSE THEORIES SINCE THE PLAINTIFF CLAIMED UNPAID COMMISSIONS ONLY."
 {¶ 34} Here DAS's assignment of error argues that the magistrate provided Gruger with a quasi-contractual theory of recovery and awarded him damages based on this theory even though Gruger never pleaded such a claim. But once again, DAS makes no further argument in its brief to support this alleged error.
 {¶ 35} Gruger, however, asserts that he adequately raised theories of implied contract and promissory estoppel in his complaint. Gruger's complaint states in part:
 {¶ 36} "3. As additional consideration for said Agreement Not to Compete, Plaintiff was to receive a three (3) year contract of employment.
 {¶ 37} "4. Defendant never entered a written employment agreement with Plaintiff; however, an employment arrangement was entered, the terms of which included an annual salary of Forty Thousand Dollars ($40,000.00), payment of expenses, commissions and bonuses.
 {¶ 38} "5. Defendant partly performed the employment Arrangement by paying an annual salary and initially paying commissions.
 {¶ 39} "6. Defendant breached the employment arrangement by failing and refusing to pay commissions the second and third years of said employment arrangement (portions of calendar years 1999, 2000 and 2001)."
 {¶ 40} Civ. R. 8(A) sets forth requirements for a complaint and provides that it must only contain a short and plain statement of the claim showing that the party is entitled to relief, and a demand for judgment. When determining whether a complaint states a claim, the court must liberally construe the pleadings. Miller v. Med. EconomicsConsultants Co., Inc., 2d Dist. No. 19177, 2002-Ohio-4972; Civ. R. 8(F). The complaint must only give notice of the nature of the claim. It "`must contain either direct allegations on every material point necessary to sustain a *Page 8 
recovery on any legal theory, even though it may not be the theory suggested or intended by the pleader, or contain allegations from whichan inference fairly may be drawn that evidence on these material pointswill be introduced at trial.'" (Emphasis sic.) Fancher v. Fancher
(1982), 8 Ohio App.3d 79, 83, 455 N.E.2d 1344, quoting 5 Wright 
Miller, Federal Practice Procedure: Civil (1969), at 120-123, Section 1216.
 {¶ 41} The magistrate found that enforcement of the commission agreement was established under either a promissory estoppel or implied contract theory. These theories may or may not have been intended by Gruger. But because the complaint contains allegations from which an inference can fairly be drawn to support an implied contract theory, the court did not err in relying on this theory.
 {¶ 42} To prove a breach of an implied contract claim, the plaintiff must demonstrate: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. Doner v. Snapp (1994), 98 Ohio App.3d 597, 600,649 N.E.2d 42.
 {¶ 43} "`[T]he existence of express or implied-in-fact contracts does hinge upon proof of all of the elements of a contract. Lucas v.Costantini (1983), 13 Ohio App.3d 367, 368, 13 OBR 449, 469 N.E.2d 927,928-929. Express contracts diverge from implied-in-fact contracts in the form of proof that is needed to establish each contractual element.Penwell v. Amherst Hosp. (1992), 84 Ohio App.3d 16, 21, 616 N.E.2d 254,257-258. In express contracts, assent to the terms of the contract is actually expressed in the form of an offer and an acceptance.Lucas, supra. On the other hand, in implied-in-fact contracts the parties' meeting of the minds is shown by the surrounding circumstances, including the conduct and declarations of the parties, that make it inferable that the contract exists as a matter of tacit understanding.Point E. Condominium Owners' Assn. v. Cedar House Assn. (1995),104 Ohio App.3d 704, 712, 663 N.E.2d 343, 348-349. To establish a contract implied in fact a plaintiff must demonstrate that the circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended. *Page 9 Lucas, supra.'" Dunn v. Bruzzese, 172 Ohio App.3d 320, 874 N.E.2d 1221,2007-Ohio-3500, at ¶ 28, quoting Stepp v. Freeman (1997),119 Ohio App.3d 68, 74, 694 N.E.2d 510.
 {¶ 44} In his complaint, Gruger alleged that he had an implied, non-written, three-year contract of employment with DAS. He also alleged that he earned commissions while working for DAS. Gruger alleged that DAS partially performed the contract by paying his annual salary and initially paying his commissions. However, Gruger asserted that DAS breached the agreement by refusing to pay commissions during Gruger's second and third years of employment. And he asserted that DAS owed him those commissions. Thus, Gruger sufficiently pleaded an implied contract theory in his complaint.
 {¶ 45} Based on the above, the magistrate did not err in basing his award on the theory of implied contract. Accordingly, DAS's second assignment of error is without merit.
 {¶ 46} DAS's sixth assignment of error states:
 {¶ 47} "WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING DEFENDANT DIVERSIFIED'S MOTION TO SET ASIDE THE MAGISTRATE'S ORDERS FILED NOVEMBER 4, 2004, WHICH REQUESTED (A) THAT THE PLAINTIFF'S TRIAL PREPARED COMMISSION LIST FILED FEBRUARY 20, 2004 BE STRICKEN AS HEARSAY; AND (B) THE MAGISTRATE JUDGE SUGGESTED THEORIES OF RECOVERY TO THE PLAINTIFF AT TRIAL WHICH WERE NOT IN ANY PLEADING FILED BY THE PLAINTIFF, BE STRICKEN."
 {¶ 48} This assignment of error simply reasserts the same arguments as DAS's first and second assignments of error combined. Therefore, for the reasons set out in our above analysis of DAS's first and second assignment of error, his sixth assignment of error is without merit.
 {¶ 49} DAS's third and fourth assignments of error share a common basis in law and fact and, therefore, we will address them together. They state: *Page 10 
 {¶ 50} "WHETHER THE MAGISTRATE JUDGE IMPERMISSIBLY OVERLOOKED TESTIMONY AND EXHIBITS WHICH DEMONSTRATED UNEQUIVOCALLY THAT APPELLEE GRUGER FAILED TO DO THE WORK ASSIGNED; THAT HE WAS NOT ASSIGNED THE WORK THAT HE CLAIMED HE DID; THAT DIVERSIFIED'S WORK WAS DONE BY OTHERS THAN GRUGER; AND THAT DIVERSIFIED'S WRITTEN POLICIES APPLICABLE TO GRUGER ALLOWED FOR THE OFFSET OF ANY COMMISSIONS WHERE THE MONIES HAD BEEN RETURNED BY DIVERSIFIED TO THE CLIENT OR CUSTOMER."
 {¶ 51} "WHETHER THE MAGISTRATE JUDGE IMPROPERLY IGNORED TESTIMONY THAT GRUGER FAILED TO FOLLOW COMPANY PROCEDURES; FAILED TO TURN IN HIS REPORTS FOR EIGHT (8) MONTHS AT A TIME; FAILED TO DO HIS JOB, YET ACTING AS IF HE WAS; AND IGNORED THE ORAL AND WRITTEN REASSIGNMENTS OF ACCOUNTS TO OTHERS AND INSTEAD IMPROPERLY CREDITED A FALSIFIED, HEARSAY COMMISSION REPORT."
 {¶ 52} DAS's argument in these assignments of error seems to be one of weight of the evidence. It asserts that the magistrate failed to consider certain evidence that weighed in its favor. DAS contends that because Gruger failed to turn in reports on time, failed to do the work which he was assigned, and did work which he was not assigned, he was not entitled to any commissions. It further contends that it had to return money to one customer, which it was entitled to offset against Gruger's commissions. Additionally, DAS argues that because Gruger was an employee at will it was not required to pay him the contested commissions.
 {¶ 53} A judgment supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. Willett v. Felger (Mar. 29, 1999), 7th Dist. No. 96-CP-40; Gerijo, Inc. v. Fairfield (1994),70 Ohio St.3d 223, 226, 638 N.E.2d 533. Furthermore, in considering whether a judgment is against the manifest weight of the evidence, it is important that this court be guided by the presumption that the findings of the trier of fact are correct. Seasons Coal Co., Inc. v. Cleveland (1984), *Page 11 
10 Ohio St.3d 77, 80, 461 N.E.2d 1273. If the evidence is susceptible to more than one interpretation, we must construe the evidence consistently with the trial court's judgment. Gerijo, 70 Ohio St.3d at 226.
 {¶ 54} DAS's defense at trial was that because Gruger did not turn in his call reports on time and because he claimed commissions for sales that were not specifically assigned to him, DAS did not owe him commissions for any of those sales. However, the evidence demonstrated a pattern over Gruger's tenure of working for DAS, whereby DAS routinely paid Gruger commissions on sales that were not assigned to him and for which he turned in his call reports, some of which were up to 90 days late.
 {¶ 55} Now on appeal, DAS argues that because Gruger was an employee at will, no contract existed between it and Gruger that would require it to pay him commissions for those sales. But this court has held otherwise. "[M]erely because an employee is `at will' for purposes of termination or quitting does not mean that an implied contract, or even an express one, does not exist to govern the relationship prior to such termination." Staffilino Chevrolet, Inc. v. Balk, 158 Ohio App.3d 1,813 N.E.2d 940, 2004-Ohio-3633, at ¶ 39. Here, an implied contract existed between DAS and Gruger based on the course of conduct by each during Gruger's time with DAS.
 {¶ 56} Implied-in-law contracts are also known as quasi-contracts.State ex rel. Bayus v. Woodland Park Properties, 7th Dist. No. 05-MA-169, 2007-Ohio-3147, at ¶ 24. To recover under a theory of an implied-in-law contract, or quasi-contract, the plaintiff must prove: "`(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment (`unjust enrichment').'" Id. at ¶ 25, quoting Hambleton v. BarryCorp. (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, quotingHummel v. Hummel (1938), 133 Ohio St. 520, 525, 14 N.E.2d 923. We must examine the evidence to determine whether Gruger proved these elements. *Page 12 
 {¶ 57} The first witness to testify was Sarah Suarez. Suarez handled accounting at DAS. She testified that Lisi made Gruger's role at DAS inconsistent as it pertained to sales. (Tr. 24-25). At times, Lisi wanted Gruger to be out on the road selling and at other times he wanted Gruger in the office. (Tr. 24-25, 36).
 {¶ 58} Gruger testified next. He stated that although they discussed it, he and DAS never reached a written employment agreement. (Tr. 44). However, they did agree that DAS would pay Gruger a salary of $40,000 per year plus commissions. (Tr. 46). This agreement was for a term of three years, starting in 1998 and ending on February 28, 2001.
 {¶ 59} In 1998, DAS paid Gruger $12,187.56 in commissions for the seven months of the year that he worked for commissions, for a monthly average of $1,714. (Tr. 53). In 1999, DAS paid appellant $14,649.09 in commissions, for a monthly average of $1,220.76. (Tr. 54). But in 2000, DAS paid Gruger a total of only $1,265.93 in commissions. (Tr. 54).
 {¶ 60} Gruger testified that Lisi told him that his job was to generate sales. (Tr. 60). During Gruger's first year, he was responsible for ten counties. (Tr. 63). His territory was then reduced to five counties. (Tr. 63). Later, Gruger learned that another salesman from DAS's Cleveland office was also doing sales in his assigned counties. (Tr. 63). During 1998 and 1999, DAS paid Gruger commissions based on all service jobs and equipment that he sold. (Tr. 81-82).
 {¶ 61} Gruger testified that he obtained sales from customers to which he was not assigned. (Tr. 85). He said that he did this because he was told his job was to generate business and Lisi told him that DAS needed business. (Tr. 85).
 {¶ 62} Gruger also testified as to his call reports. Employees were to turn in call reports at the end of each week to document their sales activity. (Tr. 85-86). Gruger admitted that he frequently turned in his call reports late. (Tr. 86). He also stated that DAS occasionally withheld his commissions until he turned in his call reports. (Tr. 87). And Gruger acknowledged that Lisi informed him that he would withhold Gruger's commissions until call reports were up to date. (Tr. 87). Gruger *Page 13 
testified that nobody at DAS ever told him that he would not get paid his commissions because his reports were late. (Tr. 87-88). And on every prior occasion of turning in late call reports, DAS paid Gruger his commissions even though the reports were late. (Tr. 88). Gruger testified that DAS had never denied him a commission before. (Tr. 116). He stated that DAS had held up his commissions because his reports were late. (Tr. 116). However, once he turned the reports in, DAS paid him the commissions. (Tr. 116). Gruger testified that when his employment with DAS ended, he brought all of his call reports up to date. (Tr. 230). He submitted eight months worth of call reports at that time. (Tr. 298). However, DAS refused to pay him the commissions.
 {¶ 63} Gruger admitted that he had been behind in his call reports since 1998. (Tr. 281). And he admitted that Lisi and Syd Orr, a sales manager, had told him several times to complete his call reports in a timely fashion. (Tr. 281-82, 287-92). Yet DAS always ended up paying his commissions once he submitted the call reports. (Tr. 287).
 {¶ 64} Gruger also acknowledged a letter to him recapping a meeting in November 1999. (Tr. 292; Def. Ex. 15). At this meeting, DAS limited Gruger to handling four accounts. (Tr. 292-93). The letter referenced these accounts and further instructed once again that if call reports were not turned in, DAS would not pay commissions. (Tr. 294). Gruger testified that after he received this letter, he continued to make sales to customers that he was not assigned to. (Tr. 339). He stated that Lisi knew about most of these sales. (Tr. 339-40).
 {¶ 65} Gruger stated that through 1999, DAS paid him commissions for sales he made outside of his assigned area. (Tr. 356). However in 2000, DAS refused to pay him for those types of sales. (Tr. 356-66).
 {¶ 66} Gruger testified that upon his termination from DAS, Lisi told him that DAS would pay him any commissions owed. (Tr. 90). Lisi told Gruger to make a list of those commissions he was entitled to. (Tr. 90-91, 107). So Gruger created Exhibit 6, listing all of the invoice numbers, customers, and sales, for which he *Page 14 
asserted he was owed commissions. (Tr. 91, 114-15). Gruger testified that he was involved in each of the sales listed. (Tr. 114-15). The total amount he testified DAS owed him was $12,047.76. (Tr. 113). Gruger testified that he turned in reports for every sale that he listed on Exhibit 6. (Tr. 341). However, DAS refused to pay most of the commissions Gruger claimed he was entitled to. (Tr. 91-92).
 {¶ 67} James Portale, another DAS salesman also testified. Portale testified that the commissions Gruger claimed appeared to be accurate. (Tr. 142-45). He verified that Gruger was involved with all of the sales claimed. (Tr. 142-45). Portale also testified as to the call reports. He stated that Lisi told him that no commissions would be paid until call reports were completed. (Tr. 145-46).
 {¶ 68} Richard Sed, DAS's electrical sales manager during 2001 testified next. Sed testified that Lisi asked him to look at the spread sheet Gruger prepared (Exhibit 6) and compare it with call reports and the November letter to Gruger specifying which accounts Gruger was responsible for. (Tr. 167-68). From these documents, Sed was to determine what commissions DAS owed Gruger. (Tr. 168). Lisi provided Sed with Gruger's call reports from April 9, 2000 through the end of 2000. (Tr. 169). Lisi also provided Sed with a copy of the November 1999 letter to Gruger instructing Gruger that as of that date he was limited to four accounts. (Tr. 170; Def. Ex. 15). Sed stated that he then went through Gruger's spread sheet and automatically determined that Gruger was not entitled to commissions on sales to anyone other than the four customers specified in the letter. (Tr. 171, 176-77, 189, 196). Thus, he determined that Gruger was entitled to only approximately $1,800. (Tr. 171-72).
 {¶ 69} Sed admitted that all of the sales listed in Exhibit 6 were approved by DAS. (Tr. 177). And he stated that he had no reason to believe that the figures Gruger listed in Exhibit 6 were inaccurate. (Tr. 197-98).
 {¶ 70} Finally, Lisi testified. Lisi stated he had told Gruger that DAS would not pay commissions until Gruger turned in his call reports. (Tr. 381). He stated that DAS determined it was not going to pay Gruger commissions for the sales listed in Exhibit 6 because Gruger did not turn in the call reports for eight months. (Tr. 385). *Page 15 
He stated that had Gruger made the same sales in 1998 or 1999, DAS would have paid him commissions as long as he submitted his call reports on time. (Tr. 424). Furthermore, Lisi testified that even when Gruger turned in call reports 90 days late, DAS still paid him commissions. (Tr. 383). And Lisi admitted that up through May of 2000, DAS always paid Gruger commissions even though he did not turn in his call reports on time. (Tr. 412-13). Finally, Lisi admitted that had Gruger turned in all of his call reports on time for the sales listed in Exhibit 6, DAS would have paid him commissions on those sales. (Tr. 424).
 {¶ 71} This evidence indicates that over the first two years and four months that Gruger worked for DAS, Gruger was consistently late in turning in his call reports and he made sales to customers to which he was not assigned. Yet DAS always paid Gruger his commissions on these sales, albeit it withheld the commissions until Gruger submitted the call reports. However, from May through December 2000, DAS determined that it would not pay Gruger most of his commissions. DAS's reasons for doing so were not entirely clear. According to Sed, DAS would not pay Gruger most of his commission because Gruger was not assigned to the sales that he made. But according to Lisi, DAS would not pay Gruger his claimed commissions because he did not turn in his call reports for these sales in a timely fashion. Either way, based on DAS's past practice of handling Gruger's commissions, it was fair for Gruger to assume that DAS would continue to pay his commissions even though he sold to customers outside of his accounts and even though he turned in his call reports late.
 {¶ 72} In at least one other instance, Gruger turned in his call reports 90 days late. Yet DAS still paid his commissions on those sales. And Lisi testified that had Gruger made the same sales that he now claimed commissions for in 1998 or 1999, DAS would have paid him the commissions he claimed. Furthermore, Lisi knew about Gruger's sales that were outside of his accounts and encouraged Gruger to generate sales. Not once did Lisi tell Gruger that DAS would not pay him commissions on these sales nor did he discourage Gruger from making these sales. *Page 16 
 {¶ 73} Additionally, DAS did not dispute the accuracy of the figures Gruger listed on Exhibit 6. It never argued that Gruger's calculation of the commissions was mistaken.
 {¶ 74} Given DAS's past practice in paying Gruger his commissions regardless of whether he was assigned to the customer and regardless of whether he turned in his call reports on time, Gruger proved all of the elements of an implied contract. Gruger clearly conferred a benefit on DAS by selling services and equipment. Lisi knew of these sales and encouraged them. DAS reaped the benefit of Gruger's sales. And it would be unjust for DAS to keep this benefit without paying Gruger his commissions given the fact that it had been DAS's past practice to pay Gruger commissions and Gruger made these sales with the expectation that DAS would continue to pay his commissions. Therefore, competent, credible evidence supports the magistrate's decision to award Gruger his claimed commissions.
 {¶ 75} We should also note that DAS cites several cases for the proposition that a discharged employee may not recover post-employment commissions on previously generated business. However, all of the commissions that Gruger claimed he was entitled to were earned during his employment. There is no indication that Gruger claimed continued commissions on sales that were in progress when he was discharged.
 {¶ 76} Accordingly, DAS's third and fourth assignments of error are without merit.
 {¶ 77} DAS's seventh assignment of error states:
 {¶ 78} "WHETHER THE LOWER COURT IMPROPERLY AWARDED THE APPELLEE UNPAID RENT WITHOUT CONSIDERING EVIDENCE OF PROPERLY SUBMITTED SET-OFFS DETAILED IN DIVERSIFIED'S COUNTERCLAIM AND TRIAL EXHIBITS."
 {¶ 79} Here DAS argues that the evidence it presented of set-offs, i.e. certain utility bills it paid that it claims it was not responsible for, not being able to use the entire premises it leased, structural concerns, and Gruger's use of office space, more *Page 17 
than make up for its unpaid lease payments. Therefore, it argues that the award to Gruger for unpaid rent was unjustified.
 {¶ 80} Once again, DAS appears to make a weight-of-the-evidence argument. Its basic assertion is that the magistrate's determination that Gruger was entitled to payment for unpaid rent and utilities was against the weight of the evidence. Thus, we will again employ the weight-of-the-evidence standard of review set out above and evaluate the evidence presented.
 {¶ 81} The parties entered into a three-year lease with a one-year extension. (Tr. 238-39). The lease extension expired on February 28, 2002.
 {¶ 82} By a letter dated October 19, 2001, Lisi gave Gruger notice that DAS would be vacating the premises. (Tr. 246; Pt. Ex. 11).
 {¶ 83} Gruger presented evidence that DAS owed him for three items: (1) rent for January and February 2002; (2) utilities for November and December 2001 and January and February 2002; and (3) the loss of use of one building.
 {¶ 84} According to Gruger, DAS owed him rent for January and February 2002, totaling $5,000. (Tr. 254-55; Pt. Ex. 13).
 {¶ 85} Furthermore, the lease provided that DAS was to pay for utilities. (Tr. 239-40; Pt. Ex. 9). DAS's utilities were monitored by sub-meters. (Tr. 240). Gruger testified that DAS failed to pay its utilities for the months of November and December 2001 and January and February 2002. (Tr. 252-53). According to Gruger, DAS owed him $484.53 for November 2001; $625.31 for December 2001; $244.16 for January 2002; and $166.56 for February 2002. (Tr. 254-55, 259-60; Pt. Exs. 13, 14).
 {¶ 86} Gruger also testified regarding what was referred to as the "ovens building." The leased premises included more than one building. The ovens building housed two large ovens used for motor repairs. (Tr. 253). Gruger stated that DAS opted to take the ovens with it when it vacated the premises. (Tr. 253-54). Gruger agreed with DAS that it could take down the building in which these very large ovens were located in order to remove them. (Tr. 254). Gruger testified that to compensate him for the loss of building space, DAS agreed to pay him $500. (Tr. *Page 18 
254). DAS failed to pay Gruger the $500. (Tr. 254-55; Pt. Ex. 13).
 {¶ 87} DAS did not dispute Gruger's figures. However, it argued that it was entitled to set off the amounts that it owed under the lease due to money it claimed Gruger cost it. It presented the following evidence in support.
 {¶ 88} Sed testified that in October 2001, he was in the leased premises and saw a man building a wall inside. (Tr. 365-66). At this time, DAS was no longer operating out of the leased premises. However, Sed testified that the builder had the lights on and was using water, even though DAS was still paying for the utilities. (Tr. 366). Sed also stated that DAS had not approved this activity. (Tr. 366). Sed further testified that on one occasion he could not get into the building because the key was not in the lock box as it was supposed to be. (Tr. 368).
 {¶ 89} Lisi testified on the subject too. He stated that as of November 1, 2001, DAS had completely vacated the leased premises. (Tr. 377). Lisi stated that the reason DAS did not pay the last two months' rent was because he had to knock down the ovens building to remove the ovens. (Tr. 398-99). Lisi testified that he did this at Gruger's insistence even though he wanted to leave the ovens there. (Tr. 398-99). Lisi stated that it cost DAS $3,500 to knock down the building and remove the ovens. (Tr. 399).
 {¶ 90} Lisi further testified that he allowed Gruger to maintain an office in the leased premises rent free after Gruger was no longer a DAS employee. (Tr. 400).
 {¶ 91} And Lisi testified about the utilities. He stated that he wanted to have the utilities turned off after DAS vacated the premises. (Tr. 402). But Lisi wanted to "winterize" the premises since DAS was still liable on the lease through February. (Tr. 402). Lisi stated that he had a company winterize the premises and that he believed he and Gruger had an agreement that DAS would no longer be responsible for any utilities after that. (Tr. 402).
 {¶ 92} In reply, Gruger testified that DAS continued to use the building space until the middle of January 2002. (Tr. 261-62). Additionally, he testified that while he did have a builder construct a wall during the lease period, DAS was already moving *Page 19 
out at this point and the construction did not limit DAS's ability to use the property. (Tr. 265-66). Furthermore, Gruger testified that because of the builder's use of electricity, he deducted $31.33 from DAS's December electric bill. (Tr. 267). Gruger next testified that he did maintain an office in the leased premises. (Tr. 268). However, Gruger stated that he had discussed this with Lisi and Lisi had given him permission to use this space after he was no longer working for DAS. (Tr.269-70). Finally, Gruger testified that he attempted to mitigate his damages by seeking a new tenant. (Tr. 270-71).
 {¶ 93} Given this evidence, it is clear that DAS failed to pay its last two months' rent and last four months' utilities. Lisi and Sed tried to justify this nonpayment by arguing they had various set-offs. But the evidence is conflicting. First, Lisi stated that DAS was out of the premises by November 1, 2001. Yet Gruger testified that DAS was not completely out until mid-January 2002. And even if DAS was out of the premises in November 2001, that would still not relieve it of its duty to pay rent under the lease. Furthermore, Gruger testified that it deducted money from DAS's electric bill for the days he had a builder on the premises. And Gruger testified that while he did maintain an office in the leased space, he did so with Lisi's permission.
 {¶ 94} The magistrate concluded that Gruger proved by a preponderance of the evidence that DAS owed the money claimed for rent, utilities, and the loss of the building. Considering the evidence detailed above, competent, credible evidence supports the magistrate's determination. Accordingly, DAS's seventh assignment of error is without merit. *Page 20 
 {¶ 95} For the reasons stated above, the trial court's judgment is hereby affirmed.
Waite, J., concurs.
DeGenaro, P.J., concurs in judgment only.
[1] Appellant s fifth assignment of error states: Whether the Trial Court erred as a matter of law by issuing its decision without deciding the Defendant's Motion for Reconsideration and other materials submitted on behalf of Appellant Diversified Air Systems regarding the Objections to the Magistrate Judge's Report and Recommendation filed on October 26, 2004." *Page 1